UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| KATHY YUNK and DIANE DZILVELIS, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>COVANTAGE CREDIT UNION, UNIVERSITY CREDIT UNION, and MARQUIS SOFTWARE SOLUTIONS, INC.,<br><br>    Defendants. | Case No. 4:26-cv-00108<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs Kathy Yunk and Diane Dzilvelis ("Plaintiffs"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through their attorneys, bring this Class Action Complaint against Defendants CoVantage Credit Union ("CoVantage"), University Credit Union ("UCU" and with CoVantage, the "Credit Union Defendants"), and Marquis Software Solutions, Inc. ("Marquis" and with the Credit Union Defendants, "Defendants"), and complain and allege upon personal knowledge as to themselves and information and belief as to all other matters.

## INTRODUCTION

1.     Plaintiffs bring this class action against Defendants for their failure to secure and safeguard the personally identifying information ("PII") of Plaintiffs and other customers of Marquis's financial institution clients, including their names, addresses, phone numbers, Social Security numbers, financial account information, taxpayer identification numbers, and dates of birth.

2.      CoVantage is a credit union based in Wisconsin with branch locations in Wisconsin, Illinois, and Michigan. UCU is a credit union whose members are students, employees, faculty, and alumni of certain universities and colleges. Marquis is a compliance and marketing service provider to banks and credit unions, including the Credit Union Defendants.

3.      On or about August 14, 2025, Marquis discovered that an unauthorized third party gained access to its network systems and acquired files containing the PII of Marquis's clients' customers, including Plaintiffs and Class members (the "Data Breach").

4.      Defendants owed a duty to Plaintiffs and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. Defendants breached that duty by, among other things, failing to, or sharing PII with third parties that failed to, implement and maintain reasonable security procedures and practices to protect Plaintiffs' and Class members' PII from unauthorized access and disclosure.

5.      As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiffs' and Class members' PII was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiffs bring this action on behalf of themselves and all persons whose PII was exposed as a result of the Data Breach, which Marquis discovered on or about August 14, 2025.

6.      Plaintiffs, on behalf of themselves and all other Class members, assert claims for negligence, breach of implied contract, unjust enrichment, and violations of the California Unfair Competition Law, and seek declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

*Plaintiff Kathy Yunk*

7.    Plaintiff Yunk is a citizen and resident of Wisconsin.

8.    Plaintiff Yunk is a former member of CoVantage. As a condition of membership and providing financial services to Plaintiff Yunk, CoVantage required her to provide it with her PII, including the PII accessed and stolen by cybercriminals in the Data Breach. CoVantage in turn shared this information with Marquis in connection with obtaining and utilizing Marquis's services.

9.    At all relevant times, CoVantage and Marquis stored and maintained Plaintiff Yunk's PII on their network systems, including the systems impacted in the Data Breach.

10.    Plaintiff Yunk received a notice letter from Marquis notifying her that her PII, including her name, date of birth, and Social Security number, was accessed and acquired by an unauthorized third party in the Data Breach.

11.    Since the Data Breach, Plaintiff Yunk has received notifications and emails about unauthorized activity and incorrect information on her credit, credit score, and transaction history that she was not responsible for. Plaintiff Yunk has already spent time attempting to rectify these issues, which remain ongoing, and reasonably expects to continue spending time and effort attempting to mitigate further harm.

12.    As a direct result of the Data Breach, Plaintiff Yunk has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of her PII.

*Plaintiff Diane Dzilvelis*

13.    Plaintiff Dzilvelis is a citizen and resident of California.

14.    Plaintiff Dzilvelis is a member of UCU. As a condition of membership and providing financial services to Plaintiff Dzilvelis, UCU required her to provide it with her PII, including the PII accessed and stolen by cybercriminals in the Data Breach. UCU in turn shared this information with Marquis in connection with obtaining and utilizing Marquis's services.

15.    At all relevant times, UCU and Marquis stored and maintained Plaintiff Dzilvelis's PII on their network systems, including the systems impacted in the Data Breach.

16.    Plaintiff Dzilvelis received a notice letter notifying her that her PII, including her name, Social Security number, and financial account information, was accessed and acquired by an unauthorized third party in the Data Breach.

17.    Plaintiff Dzilvelis is careful to limit the sharing of her PII, including by opting out of non-essential data sharing processes, such as for marketing purposes, whenever possible. Plaintiff Dzilvelis opted out of allowing UCU to share her PII with third parties such as Marquis, yet UCU shared her PII with Marquis anyway.

18.    Since the Data Breach, Plaintiff Dzilvelis has experienced a large increase in the number of spam mail and emails she receives.

19.    Due to the certain and impending risk of fraud and identity theft she faces as a result of the Data Breach, Plaintiff Dzilvelis spent time and effort freezing her credit and freezing her UCU account.

20.    As a direct result of the Data Breach, Plaintiff Dzilvelis has suffered injury and damages including, inter alia, a substantial and imminent risk of identity theft; the wrongful

disclosure and loss of confidentiality of her highly sensitive PII; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of her PII.

***Defendant CoVantage Credit Union***

21.    Defendant CoVantage Credit Union is a credit union organized under the laws of Wisconsin with its principal place of business located at 723 6th Ave, Antigo, WI 54409.

***Defendant University Credit Union***

22.    Defendant University Credit Union is a California nonprofit corporation with its principal place of business located at 1500 S. Sepulveda Blvd., Los Angeles, CA 90025. It may be served through its registered agent: Alana Anaya, 2629 Townsgate Road, Suite 140, Westlake Village, CA 91361.

***Defendant Marquis Software Solutions, Inc.***

23.    Defendant Marquis Software Solutions, Inc., is a Texas corporation with its principal place of business located at 6509 Windcrest Drive, Suite 170, Plano, TX 75024. It may be served through its registered agent: C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

## JURISDICTION AND VENUE

24.    The Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

25.    This Court has general personal jurisdiction over Defendant Marquis Software Solutions, Inc. because it is incorporated under the laws of this State and maintains its principal place of business in this District. This Court has personal jurisdiction over Defendants CoVantage

Credit Union and University Credit Union because they contracted for the performance of business in this State and contracted for goods or services in this State.

26.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant Marquis Software Solutions, Inc.'s principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of Defendants*

27.    CoVantage is a credit union serving Wisconsin, Michigan, and Illinois.[1] UCU is a credit union whose members include students, employees, faculty, and alumni of certain universities and colleges, including many in California and Texas.[2] Marquis provides marketing and compliance solutions to over 700 banks and credit unions.[3]

28.    In the regular course of their businesses, Credit Union Defendants collect and maintain the PII of their members, including the PII stolen in the Data Breach, before providing them with financial services. Credit Union Defendants in turn shared this PII with Marquis in connection with receiving services from Marquis.

29.    On its website, Marquis maintains a Privacy Policy (the "Marquis Privacy Policy") which describes its practices regarding the PII it collects from its financial institution customers.[4]

---

[1] *Who we are*, CoVantage, https://www.covantagecu.org/about/who-we-are (last accessed Jan. 26, 2026).

[2] *See Membership made easy*, UCU, https://www.ucu.org/memberships/eligibility (last accessed Jan. 26, 2026).

[3] *About Us*, Marquis, https://gomarquis.com/who-we-are/about-us (last accessed Jan. 26, 2026).

[4] *Privacy Policy*, Marquis (Sept. 16, 2020), available at: https://web.archive.org/web/20250906184908/https://gomarquis.com/privacy-policy [hereinafter, "*Marquis Privacy Policy*"].

According to its Privacy Policy, Marquis uses PII to, among other things, perform its contractual obligations with its financial institution customers and to "detect data security incidents."[5]

30.    The Marquis Privacy Policy states Marquis's "contractual agreements with our client financial institutions generally require us to follow the same practices as they do with respect to the privacy and protection of personal information."[6] Marquis promises it does not share or disclose PII for any purpose other than those enumerated in the Marquis Privacy Policy.[7]

31.    Marquis promises:

We build security into [] all of our services in order to protect your information. We use commercially reasonable and appropriate safeguards, including the encryption of personal information, to secure and protect the privacy, accuracy, and reliability of your information and to protect it from unauthorized access, alteration, disclosure, or destruction.[8]

32.    On its website, CoVantage maintains a Privacy Policy (the "CoVantage Privacy Policy") which describes CoVantage's practices regarding the PII it collects from its members.[9] CoVantage represents it only uses members' PII for purposes including its business operations and marketing.[10]

33.    CoVantage promises that to protect members' PII from unauthorized access and use, it uses "security measures that comply with federal law," including "computer safeguards and secured files and buildings."[11]

---

[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *What Does CoVantage Credit Union Do With Your Personal Information?*, CoVantage (Aug. 2024),                https://www.covantagecu.org/getmedia/83b8167b-d23a-4d77-82a2-94bed91dbfaf/Privacy-Policy-82024.pdf [hereinafter "*CoVantage Privacy Policy*"].
[10] *Id.*
[11] *Id.*

34.     On its website, UCU maintains a Privacy Policy (the "UCU Privacy Policy") which describes UCU's practices regarding the PII it collects from its members.[12] UCU represents it only uses members' PII for purposes including its business operations and marketing.[13]

35.     UCU promises:

University Credit Union places a high priority on keeping member information confidential and secure. We recognize that you expect privacy and security for your personal and financial affairs. We understand the need to safeguard sensitive information about you that you have entrusted to us.[14]

36.     The UCU Privacy Policy also states that "[t]o protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings."[15]

37.     Plaintiffs and Class members are, or were, customers of Marquis's clients, including Credit Union Defendants, and Marquis stored Plaintiffs' and Class members' PII on its network systems.

### *The Data Breach*

38.     On or about August 14, 2025, Marquis discovered that an unauthorized third party gained access to its network system and acquired files containing the PII of Plaintiffs and Class members, including their names, addresses, phone numbers, Social Security numbers, financial account information, taxpayer identification numbers, and dates of birth.[16]

---

[12] *Privacy Policy*, UCU, https://www.ucu.org/disclosures/privacy-policy (last accessed Jan. 26, 2026) [hereinafter "*UCU Privacy Policy*"].
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *See* CoVantage, *Notice of Data Breach*, NH.gov (Nov. 26, 2025), https://mm.nh.gov/files/uploads/doj/remote-docs/covantage-credit-union-marquis-software-solutions-20251126.pdf; Marquis, *Data Breach Notification*, Iowa Att'y Gen. (Nov. 26, 2025), https://www.iowaattorneygeneral.gov/media/cms/11262025_Marquis_Software_Solutions_C797 355999F87.pdf.

39.    The Data Breach was the result of a breach of Marquis's SonicWalls firewalls.[17] This is a known tactic of the notorious Akira ransomware group.[18] Upon information and belief, the Data Breach was a targeted attack by cybercriminals motivated by a desire to access, steal, misuse, and sell sensitive PII.

40.    Despite learning of the Data Breach on or about August 14, 2025, Marquis waited until approximately November 26, 2025—over three months later—to announce the Data Breach and begin notifying Plaintiffs and Class members that their PII was accessed and acquired by unauthorized persons.[19] Defendants' failure to promptly notify Plaintiffs and Class members that their PII was disclosed, accessed, and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII before Plaintiffs and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiffs and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

### *Defendants Knew that Criminals Target PII*

41.    At all relevant times, Defendants knew, or should have known, that the PII that they collect, store, and share was a target for malicious actors. Despite such knowledge, Defendants failed, or shared PII with third parties that failed to, implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class members' PII from unauthorized disclosures and cyberattacks that they should have anticipated and guarded against.

---

[17] Lawrence Abrams, *Marquis data breach impacts over 74 US banks, credit unions*, BLEEPING COMPUTER (Dec. 3, 2025 5:06 PM), https://www.bleepingcomputer.com/news/security/marquis-data-breach-impacts-over-74-us-banks-credit-unions/.

[18] *Id.*; Steve Zurier, *Ransomware attack on Marquis Software Solutions targeted 74 banks*, SC MEDIA (Dec. 4, 2025), https://www.scworld.com/news/ransomware-attack-on-marquis-software-solutions-targets-74-banks.

[19] *See* CoVantage, *Notice of Data Breach*, *supra* note 16.

42.    It is well known among companies that store sensitive personally identifying information that such information—such as the PII stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[20]

43.    PII is a valuable property right.[21] The value of PII as a commodity is measurable.[22] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[23] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[24] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

44.    Criminals piece together bits and pieces of compromised PII for profit by creating "Fullz" packages. "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number,

---

[20] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, Bus. Insider (Nov. 19, 2019), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[21] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[22] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, Medscape (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[23] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLibrary (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[24] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, Interactive Advert. Bureau (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

date of birth, and more.

45.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

46.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

47.    Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to criminals (like illegal and scam telemarketers).

48.    Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[25]

---

[25] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

49.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### *Theft of PII Has Grave and Lasting Consequences for Victims*

50.     Theft of PII can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[26][27]

51.     Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[28]

---

[26] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Jan. 26, 2026).

[27] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[28] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

52.    Identity theft is not an easy problem to solve. In a 2025 survey, the Identity Theft Resource Center found that 20% of victims of identity misuse needed more than 30 days to resolve issues stemming from identity theft and 13% required three months or more.[29]

53.    There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[30]

54.    It is within this context that Plaintiffs and all other Class members must now live with the knowledge that their PII is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

### *Damages Sustained by Plaintiffs and Class Members*

55.    Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the disclosure, compromise, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised

---

[29] Identity Theft Resource Center, *2025 Consumer Impact Report*, IDENTITY THEFT RES. CTR. (2025), https://www.idtheftcenter.org/publication/itrc-2025-consumer-impact-report/ (last accessed Jan. 26, 2026).
[30] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019),
 http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## CLASS ALLEGATIONS

56.     This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

57.     Plaintiffs bring this action on behalf of themselves and all members of the following Class of similarly situated persons:

> All persons whose PII was accessed in the Data Breach by unauthorized persons, including all who were sent a notice of the Data Breach.

58.     Plaintiff Yunk also brings this action on behalf of herself and all members of the following Subclasses of similarly situated persons:

> **CoVantage Subclass**
> All persons who provided their PII to CoVantage and whose PII was accessed in the Data Breach by unauthorized persons, including all who were sent a notice of the Data Breach.

59.     Plaintiff Dzilvelis also brings this action on behalf of herself and all members of the following Subclasses of similarly situated persons:

> **UCU Subclass**
> All persons who provided their PII to University Credit Union and whose PII was accessed in the Data Breach by unauthorized persons, including all who were sent a notice of the Data Breach.

60.     Excluded from the Class are Marquis Software Solutions, Inc., and its affiliates, parents, subsidiaries, officers, agents, board members, and directors; CoVantage Credit Union, and its affiliates, parents, subsidiaries, officers, agents, board members, and directors; University Credit Union, and its affiliates, parents, subsidiaries, employees, officers, agents, board members, and directors; as well as the judge(s) presiding over this matter and the clerks of said judge.

61. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

62. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. Marquis reported to the Maine Attorney General that the Data Breach affected approximately 42,784 residents of Maine alone.[31]

63. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

  a. whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class members' PII from unauthorized access and disclosure;

  b. whether Defendants had duties not to disclose the PII of Plaintiffs and Class members to unauthorized third parties;

  c. whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class members' PII;

  d. whether Defendants breached their duties to protect Plaintiffs' and Class members' PII; and

  e. whether Plaintiffs and Class members are entitled to damages and the measure of such damages and relief.

64. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

---

[31] Marquis, *Marquis Software Solutions Data Breach Notification*, MAINE.GOV (Dec. 2, 2025), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/d8efd2f6-f52d-49d3-be53-028e9a8cb837.html.

65.     Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their PII compromised in the Data Breach. Plaintiffs and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

66.     Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class in that they have no interests adverse to, or that conflict with, the Class they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

67.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

68.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

69.     Defendants owed a duty to Plaintiffs and Class members to exercise reasonable care in safeguarding and protecting the PII they collect, share, and maintain.

70.     Defendants' duties arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as Defendants, of failing to employ reasonable measures to protect and secure PII.

71.     Defendants violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and other Class members' PII, by failing to provide timely notice, and by not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII they obtain and store, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiffs and the other Class members.

72.     Defendants' violations of Section 5 of the FTCA constitute negligence per se.

73.     Plaintiffs and Class members are within the class of persons that Section 5 of the FTCA were intended to protect.

74.     The harm occurring as a result of the Data Breach is the type of harm that Section 5 of the FTCA was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security

measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiffs and Class members as a result of the Data Breach.

75.    Defendants knew or should have known the risks of collecting, sharing, and storing Plaintiffs' and all other Class members' PII and the importance of maintaining secure systems. Defendants knew or should have known of the many data breaches that targeted companies that collect and store PII in recent years.

76.    Given the nature of Defendants' business, the sensitivity and value of the PII they maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems or their third-party vendor's inadequate data security and prevented the Data Breach from occurring or should not have provided PII to third-party vendors with inadequate data security.

77.    Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII by failing to, or failing to ensure that their third-party vendors, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiffs' and Class members' PII.

78.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII by failing to, or failing to ensure that their third-party vendors, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class members' PII to unauthorized individuals.

18

79.     But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiffs and Class members, their PII would not have been compromised.

80.     As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and Class members have suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT II
### BREACH OF IMPLIED CONTRACT
*By Plaintiff Yunk Individually and on Behalf of the CoVantage Subclass Against CoVantage Only*

81.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

82.     Plaintiff Yunk brings this claim individually and on behalf of the CoVantage Subclass against CoVantage only.

83.     In connection with receiving financial services, Plaintiff Yunk and all other CoVantage Subclass members entered into implied contracts with CoVantage.

84.     Pursuant to these implied contracts, Plaintiff Yunk and CoVantage Subclass members provided CoVantage with their PII. In exchange, CoVantage agreed to, among other

things, and Plaintiff Yunk and CoVantage Subclass members understood that CoVantage would: (1) provide financial services to Plaintiff Yunk and CoVantage Subclass members; (2) collect, maintain, and utilize Plaintiff Yunk's and CoVantage Subclass members' PII to, among other things, facilitate financial services to Plaintiff Yunk and CoVantage Subclass members; (3) take reasonable measures to protect the security and confidentiality of Plaintiff Yunk's and CoVantage Subclass members' PII; (4) protect Plaintiff Yunk's and CoVantage Subclass members' PII in compliance with federal and state laws and regulations, industry standards, and CoVantage's representations; and (5) maintain the confidentiality of Plaintiff Yunk's and CoVantage Subclass members' PII and protect it from unauthorized access, disclosure, theft, and misuse.

85.    The protection of PII was a material term of the implied contracts between Plaintiff Yunk and CoVantage Subclass members, on the one hand, and CoVantage, on the other hand. Indeed, as set forth *supra*, CoVantage recognized the importance of data security and the privacy of its members' PII in its Privacy Policy. Had Plaintiff Yunk and CoVantage Subclass members known that CoVantage would not adequately protect its members' PII, they would not have agreed to provide CoVantage with their PII or received financial services from CoVantage.

86.    Plaintiff Yunk and CoVantage Subclass members performed their obligations under the implied contract when they provided CoVantage with their PII.

87.    CoVantage breached its obligations under its implied contracts with Plaintiff Yunk and CoVantage Subclass members in failing to, or failing to ensure that their third-party vendors, implement and maintain reasonable security measures to protect and secure their PII and in failing to implement and maintain reasonable security protocols and procedures to protect Plaintiff

Yunk's and CoVantage Subclass members' PII in a manner that complies with applicable laws, regulations, industry standards, and CoVantage's representations.

88.     CoVantage's breach of its obligations of its implied contracts with Plaintiff Yunk and CoVantage Subclass members directly resulted in the Data Breach and the injuries that Plaintiff Yunk and all other CoVantage Subclass members have suffered from the Data Breach.

89.     Plaintiff Yunk and all other CoVantage Subclass members were damaged by CoVantage's breach of implied contracts because: (i) they provided their PII to CoVantage in exchange for data security protection they did not receive;; (ii) they face a substantially increased risk of identity theft—risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII has been breached; (v) they were deprived of the value of their PII, for which there is a well-established national and international market; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

<u>COUNT III</u>
**BREACH OF IMPLIED CONTRACT**
*By Plaintiff Dzilvelis Individually and on Behalf of the UCU Subclass Against UCU Only*

90.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

91.     Plaintiff Dzilvelis brings this claim individually and on behalf of the UCU Subclass against UCU only.

92.     In connection with receiving financial services, Plaintiff Dzilvelis and all other UCU Subclass members entered into implied contracts with UCU.

93.     Pursuant to these implied contracts, Plaintiff Dzilvelis and UCU Subclass members provided UCU with their PII. In exchange, UCU agreed to, among other things, and Plaintiff Dzilvelis and UCU Subclass members understood that UCU would: (1) provide financial services to Plaintiff Dzilvelis and UCU Subclass members; (2) collect, maintain, and utilize Plaintiff Dzilvelis's and UCU Subclass members' PII to, among other things, facilitate financial services to Plaintiff Dzilvelis and UCU Subclass members; (3) take reasonable measures to protect the security and confidentiality of Plaintiff Dzilvelis's and UCU Subclass members' PII; (4) protect Plaintiff Dzilvelis's and UCU Subclass members' PII in compliance with federal and state laws and regulations, industry standards, and UCU's representations; and (5) maintain the confidentiality of Plaintiff Dzilvelis's and UCU Subclass members' PII and protect it from unauthorized access, disclosure, theft, and misuse.

94.     The protection of PII was a material term of the implied contracts between Plaintiff Dzilvelis and UCU Subclass members, on the one hand, and UCU, on the other hand. Indeed, as set forth *supra*, UCU recognized the importance of data security and the privacy of its members' PII in its Privacy Policy. Had Plaintiff Dzilvelis and UCU Subclass members known that UCU would not adequately protect its members' PII, they would not have agreed to provide UCU with their PII or received financial services from UCU.

95.     Plaintiff Dzilvelis and UCU Subclass members performed their obligations under the implied contract when they provided UCU with their PII.

96.     UCU breached its obligations under its implied contracts with Plaintiff Dzilvelis and UCU Subclass members in failing to, or failing to ensure that their third-party vendors, implement and maintain reasonable security measures to protect and secure their PII and in failing to implement and maintain reasonable security protocols and procedures to protect Plaintiff

Dzilvelis's and UCU Subclass members' PII in a manner that complies with applicable laws, regulations, industry standards, and UCU's representations.

97.    UCU's breach of its obligations of its implied contracts with Plaintiff Dzilvelis and UCU Subclass members directly resulted in the Data Breach and the injuries that Plaintiff Dzilvelis and all other UCU Subclass members have suffered from the Data Breach.

98.    Plaintiff Dzilvelis and all other UCU Subclass members were damaged by UCU's breach of implied contracts because: (i) they provided their PII to UCU in exchange for data security protection they did not receive;; (ii) they face a substantially increased risk of identity theft—risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII has been breached; (v) they were deprived of the value of their PII, for which there is a well-established national and international market; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

## COUNT IV
## UNJUST ENRICHMENT

99.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

100.    This claim is pleaded in the alternative to the breach of implied contract claims.

101.    Plaintiffs and Class members conferred a monetary benefit upon Defendants in the form of monies paid for financial services (directly or indirectly), by creating financial accounts at Credit Union Defendants, and through the provision of their PII. Credit Union Defendants in turn used the monies and PII from Plaintiffs and Class members to obtain services from Marquis.

102.    Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiffs and Class members. Defendants also benefitted from the receipt of Plaintiffs' and Class members' PII, as this was used to facilitate financial services.

103.    As a result of Defendants' conduct, Plaintiffs and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that they paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

104.    Defendants should not be permitted to retain the money belonging to Plaintiffs and Class members because Defendants failed to adequately implement the data privacy and security procedures for themselves that Plaintiffs and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

105.    Plaintiffs and Class members have no adequate remedy at law.

106.    Defendants should be compelled to provide for the benefit of Plaintiffs and Class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

<u>**COUNT V**</u>
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL")**
***By Plaintiff Dzilvelis Individually and on Behalf of the UCU Subclass Against UCU and Marquis Only***

107.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

108.    Plaintiff Dzilvelis brings this claim individually and on behalf of the UCU Subclass against UCU and Marquis only.

109.    The UCL prohibits any "unlawful" or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law. By virtue

of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Defendants[32] engaged in unlawful, unfair, and fraudulent practices within the meaning, and in violation of, the UCL.

110.   In the course of conducting its business, Defendants committed "unlawful" business practices by, *inter alia*, knowingly failing to, or failing to ensure that their third-party vendors, design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff Dzilvelis's and UCU Subclass members' PII, and by violating the statutory and common law alleged herein, including, *inter alia*, Section 5 of the FTCA and Article I, Section 1 of the California Constitution (California's constitutional right to privacy). Plaintiff Dzilvelis and UCU Subclass members reserve the right to allege other violations of law by Defendants constituting other unlawful business acts or practices. Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

111.   Defendants' above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Defendants' wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendants' practices are also contrary to legislatively declared and public policies that seek to protect PII and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as Article I, Section 1 of the California Constitution (California's constitutional right to privacy) and Section 5 of the

---

[32] "Defendants" as used in this claim refers to Defendants UCU and Marquis only.

FTCA. The gravity of Defendants' wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in the above-described wrongful conduct.

112.    The injury and harm that Plaintiff Dzilvelis and UCU Subclass members suffered was the direct and proximate result of Defendants' violations of the UCL. Plaintiff Dzilvelis and UCU Subclass members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; (vii) loss of value of the PII that was compromised in the Data Breach; and (viii) overpayment for the services that were received without adequate data security.

113.    Unless restrained and enjoined, Defendants will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiff Dzilvelis, UCU Subclass members, and the general public, also seek restitution and an injunction prohibiting Defendants from continuing such wrongful conduct, and requiring Defendants to modify their corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII entrusted to it, as well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code § 17203.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all other members of the Class, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A.      Certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

B.      Awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.      Awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.      Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiffs and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: January 30, 2026

Respectfully submitted,

*/s/ Bruce W. Steckler*
Bruce W. Steckler
**STECKLER WAYNE & LOVE PLLC**
12720 Hillcrest Suite 1045
Dallas, Texas 75230
Tel: 972.387.4040
bruce@stecklerlaw.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiffs*

**Pro hac vice* forthcoming